William D. Hyslop
United States Attorney
Eastern District of Washington
Patrick J. Cashman
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>    v.<br><br>JUANITA RAMIREZ,<br><br>               Defendant. | 1:19-CR-02058-SMJ-4<br><br>United States' Response to Defendant's Motion for Severance |

Plaintiff, United States of America, by and through William D. Hyslop, United States Attorney, for the Eastern District of Washington, and Patrick J. Cashman, Assistant United States Attorney for the Eastern District of Washington, respectfully submits the following response to Defendant's Motion to Suppress Statements and Evidence Stemming from Search Warrant. (ECF No. 100).

## I.    Introduction

The Defendant, Juanita Ramirez, argues the statement she made to a Detective Tucker of the Yakima County Sheriff's Office (YSO) on August 1, 2019, was taken in violation of her constitutional rights because the attorney whose presence she requested may have had a conflict of interest. The United States contends first, the Defendant knowingly, intentionally, and voluntarily waived her

United States' Response to Defendant's Motion for Suppression – 1

rights pursuant to *Miranda v. Arizona*, second, there was no government misconduct warranting suppression, and third, assuming *arguendo* her attorney a conflict of interest, the Defendant waived it. Defendant's Motion to Suppress should be denied and any evidence obtained as a result of Defendant's statement is fully admissible.

## II.    Factual Background

On July 31, 2019, at approximately 12:04 a.m., YSO deputies were dispatched to the address of 171 N. Outlook Road in reference to a robbery that just occurred. The deputies were advised that the victim was just robbed and beaten at gun point prior to his car being taken. Upon arriving on scene, the deputies observed severe swelling to his mouth and face as well as fresh cuts to his right and left hands.

While speaking with the victim, he identified the initial perpetrators as two males as "Grinch" and "Chato" and a third male as Miguel Navarrete. The victim detailed he was in the rear seat behind the driver's seat. The victim stated "Chato" opened the driver side door, while "Grinch" attempted to enter the car from the passenger side. The victim stated that "Grinch" brandished a firearm and ordered him to open the door, at which point he was physically assaulted.[1]

As the victim was being assaulted, a white Chrysler 300 (owned by attorney Bill Schuler) driven by Juanita Ramirez, arrived and a fourth male exited the front passenger seat and assisted in taking the victim's red Mazda Tribute. The fourth individual, believed to be "Shooter," entered the driver's seat of the victim's vehicle. The victim tried to stop "Shooter" from taking his vehicle. In response "Shooter" stated, "They call me Shooter, don't make me shoot you," and then

---

[1] The victim has provided numerous statements in this case. The factual recitation summarizes information provided pursuant to the various statements.

United States' Response to Defendant's Motion for Suppression – 2

motioned to his pocket. The victim observed what he believed to be the butt of a handgun.

Subsequently, "Shooter" drove off in the victim's vehicle followed by the white Chrysler 300 being driven by Juanita Ramirez, with "Chato" as a passenger. The remaining individuals drove off in two other vehicles.

The following day, on August 1, 2019, a Zillah Police Department patrol officer observed a white Chrysler 300 matching the description of the vehicle used in the commission of the carjacking. The patrol officer initiated a traffic stop. The Defendant, Juanita Ramirez, was identified as the driver. There was another female passenger, who was subsequently released from the scene after identification. Prior to being transported to the Yakima County Sheriff's Office, a deputy sheriff advised the Defendant of her *Miranda* warnings. *See* Attachment A (Report of Sgt. Peterschick, dated August 1, 2019). The Defendant stated that she would waive her rights. Upon arrival at the YSO Precinct, the Defendant requested to speak with her attorney, "Bill Schuler," prior to speaking with Detective Tucker. Sgt. Peterschick attempted numerous times to reach Mr. Schuler with negative results.

Upon Detective Tucker's arrival, the Defendant was again advised of her *Miranda* warnings, which she agreed to waive in writing. However, the Defendant again requested to attempt to reach Mr. Schuler by phone. *See* Attachment B (Report of Detective Tucker, dated August 1, 2019). The Defendant attempted contact with Mr. Schuler but was only able to leave a voicemail. Detective Tucker inquired into the Defendant's willingness to speak to law enforcement without having had the opportunity to confer with Mr. Schuler. The Defendant stated "I have nothing to hide" and that she, "want[ed] to tell the truth." Prior to any formal questioning, Mr. Schuler returned Detective Tucker's call. The Defendant was given an opportunity to speak with Mr. Schuler in private. Subsequently, Mr.

United States' Response to Defendant's Motion for Suppression – 3

Schuler advised Detective Tucker that he was en route to the precinct and that law enforcement could interview his "client" upon his arrival. When Mr. Schuler arrived, the Defendant and Mr. Schuler conferred privately for approximately twenty to twenty-five minutes. *See* Attachment B. At the end of the private discussion, Mr. Schuler advised Detective Tucker the Defendant wished to speak with law enforcement.

Detective Tucker and two other officers entered the interview. Detective Tucker asked the Defendant if she still understood her rights and was willing to speak with law enforcement about the incident, the Defendant responded in the affirmative. Mr. Schuler confirmed the Defendant was willing to answer questions. Detective Tucker informed the Defendant that she was still being arrested. The Defendant then stated that she understood and that she "did not want to go down for what they did." The Defendant proceeded to give a statement that incriminated herself as well as others. Upon conclusion of the interview, the Defendant was booked into the Yakima County Jail on a charge of Rendering Criminal Assistance in the First Degree. *See* Attachment B.

### III.   Law and Argument

A. <u>The Sixth Amendment right to counsel is inapplicable because the Defendant had not been charged.</u>

The Defendant, at the time of her arrest, had not been charged nor had formal prosecution commenced. Therefore, Sixth Amendment protections are inapplicable to the Defendant's pre-charging statement. The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. The "right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant .... by way of indictment, information, arraignment, or

United States' Response to Defendant's Motion for Suppression – 4

preliminary hearing." *United States v. Gouveia,* 467 U.S. 180, 187 (1984). The Sixth Amendment protections are charge specific. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Once a Defendant, who has been the subject of adversary judicial proceedings by way of indictment, information, arraignment, or preliminary hearing, has asserted their Sixth Amendment right to counsel, law enforcement is prohibited from communicating about the circumstances of the charge without the counsel present. However, since the Defendant had not been formally charged, analysis under the Sixth Amendment right to counsel, and any type of conflict of interest analysis under the Sixth Amendment, is not appropriate.

    B. <u>The Defendant was provided counsel of her choosing.</u>

It is well-established that *Miranda v. Arizona*, 384 U.S. 436 (1966), established a set of prophylactic rules to ensure that suspects' Fifth Amendment rights are protected. *See e.g. Oregon v. Elstad*, 470 U.S. 298, 306-07 (1985). Essentially, *Miranda* requires that suspects in law enforcement "custody" receive warnings about their rights before they are subjected to "interrogation," and that any statement made by such suspect is the product of a knowing, intelligent, and voluntary waiver. *See generally id.*; *Dickerson v. United States*, 530 U.S. 428, 444 (2000). The United States bears the burden of showing by a preponderance of the evidence that there was a knowing, intelligent, and voluntary waiver of Fifth Amendment rights. *See Colorado v. Connelly*, 469 U.S. 157, 167-69 (1986). A waiver of *Miranda* rights does not have to be explicit – it may be implied by answering questions after receiving the warnings. *See e.g. United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir.), *amended*, 416 F.3d 939 (9th Cir. 2005), *cert. denied*, 549 U.S. 1214 (2007). A defendant's waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

United States' Response to Defendant's Motion for Suppression – 5

When a defendant invokes their right to counsel, all interrogation must cease until counsel is present. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *see also Minnick v. Mississippi*, 498 U.S. 146, 153 (1990) (holding that invocation of right to the presence of counsel continues after counsel and defendant have conferred).

The Defendant was permitted to confer with Mr. Schuler, which she did for 20-25 minutes before the interview took place. Attachment B. She was provided the assistance of counsel of her choosing prior to being interviewed by law enforcement. Additionally, counsel of her choosing was present for the full duration of the interview. Therefore, the Defendant's right to counsel was appropriately safeguarded.

C. <u>The Defendant knowingly, intelligently, and voluntarily waiver her right to silence.</u>

   i.   Voluntariness

A statement following *Miranda* warnings will "rare[ly]" be deemed involuntary. *Dickerson v. United States*, 530 U.S. 428, 444 (2000). For a statement to be involuntary, it must be "extracted by. . . threats or violence"; or "obtained by. . . direct or implied promises" or "the exertion of improper influence." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc), *cert. denied*, 522 U.S. 874 (1997).

When determining involuntariness, the crucial inquiry is whether the defendant's will has been "overborne" or his capacity for self-determination critically impaired." *United States v. Pelton*, 835 F.2d 1067, 1071-72 (4th Cir. 1987), *cert. denied*, 486 U.S. 1010 (1988); *accord Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973); *Braxton*, 112 F.3d at 781; *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980), *cert. denied*, 449 U.S. 904 (1980).

United States' Response to Defendant's Motion for Suppression – 6

Before a finding of involuntariness is made, coercive government conduct is required. *Connelly*, 479 U.S. at 165 (even if mentally ill defendant "ordered by the voice of God" to confess felt "coerced," the coercion was not attributable to the government). *See also Braxton*, 112 F.3d at 781-83 (neither statement by agents that they "needed" to speak to defendant nor their warning that he would "face five years" if he did not "come clean" sufficiently coercive to render subsequent statement involuntary); *United States v. Elie*, 111 F.3d 1135, 1143-44 (4th Cir. 1997) ("coercive police activity is a necessary predicate to a finding that a statement is not voluntary within the meaning of the due process clause"), *abrogated on other grounds by United States v. Sterling*, 283 F.3d 216 (4th Cir. 2002).

In determining voluntariness of a statement, a court examines "the totality of the circumstances," including the defendant's individual characteristics and background, the setting in which the statement occurred, and the details of the interrogation or interview. *Elie*, 111 F.3d at 1143-44; *Pelton*, 835 F.2d at 1071; *accord United States v. Van Metre*, 150 F.3d 339, 348-49 (4th Cir. 1998) (55 hour delay between arrest and initial court appearance did not render confessions involuntary in light of "totality of circumstances," noting absence of "coercive police conduct"). Likewise, to be voluntary, the circumstances surrounding the interrogation or interview need not be entirely free from intimidation. *Braxton*, 112 F.3 at 780-82; *Pelton*, 853 F.2d at 1072. Rather, "[t]ruthful statements about [the defendant's] predicament are not the type of coercion that threatens to render a statement involuntary." *Braxton*, 112 F.3d at 782 (internal quotation and citation omitted) (approving the practice of warning subject of additional charges and penalties he may face for making false statements to interviewing agents or officers).

United States' Response to Defendant's Motion for Suppression – 7

The Defendant was not coerced to provide a statement in this case. To the contrary, the law enforcement officers treated the Defendant with respect, advised her multiple times of her rights, permitted her to contact her attorney numerous times, and spoke frankly with the Defendant about the process and their intentions at the conclusion of the interview. Moreover, law enforcement appropriately waited to conduct any meaningful interview of the Defendant until after she met with her attorney for approximately twenty to twenty five minutes. She was asked at the conclusion of that private discussion if she still understood her rights and if she still wanted to answer questions; Defendant responded to both that she did. When considering the totality of the circumstances before the Court, the Defendant's waiver was voluntarily made. Law enforcement did not engage in any type of conduct that would overborne the will of the Defendant.

        ii.     Knowing and Intelligent

The second prong of waiver analysis looks at whether the waiver was knowing and intelligent. Again, a knowing and intelligent waiver depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards*, 451 U.S. at 482. A waiver is "knowing and intelligent if, under the totality of the circumstances, it is made with a 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Id.* (citing *U.S. v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (quoting *Burbine*, 475 U.S. at 421). It is irrelevant whether the defendant's decision is sensible, prudent, or wise. *See United States v. Curcio*, 680 F.2d 881, 885-89 (2nd Cir. 1981) (quoting *Faretta v. California*, 422 U.S. at 834) (stating in context of waiver of conflict in joint defense representations but applicable in *Miranda* waiver context). As noted in *Edwards*, the United States Supreme Court "consistently has rejected any paternalistic rule protecting a defendant from his intelligent and voluntary

United States' Response to Defendant's Motion for Suppression – 8

decisions about his own criminal case." *Edwards*, 451 U.S. at 490-91 (internal quotation omitted). The questions are: (1) was the defendant informed; and (2) does the defendant have the capacity to make a rational decision. *Curcio*, at 885-89.

When considering the totality of the circumstances, it is clear the Defendant knowingly and intelligently waived her rights. The Defendant was informed of her rights. The Defendant was properly informed of the consequences of waiving her rights, in that anything she said could be used against her. The Defendant was further informed that regardless of what she decided, law enforcement intended to book her in jail. The Defendant signed a written waiver form after she had been advised of her *Miranda* warnings at least twice. The Defendant stated that she understood her rights and wished to waive these rights. The Defendant's specific requests to call her attorney, which law enforcement obliged and facilitated, is yet another indication that she fully understood—and exercised—her rights.

The Defendant further indicated to law enforcement, in the presence of her attorney after speaking with that same attorney, that she understood her rights and still wished to speak with law enforcement. The Defendant speaks English effectively. The Defendant also has prior experience with the criminal justice system, having been arrested and convicted of an alcohol related traffic offense. Having been advised of her rights on this occasion, she indicated she was willing to speak to law enforcement after talking to her attorney, and that is precisely what happened.

D. <u>There was no Government misconduct warranting suppression.</u>

The exclusionary rule prohibits the Government from using evidence that was unlawfully seized. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). That is to say, the evidence is the product of illegal government activity. *Segura*,

United States' Response to Defendant's Motion for Suppression – 9

468 U.S. 796, 815 (1984). The rule was created as a "means of deterring illegal searches and seizures." *Penn. Bd. Of Prob. & Parole v. Scott*, 524 U.S. 357 (1998). The suppression of evidence is a "last resort" and done "only where its deterrence benefits outweigh its substantial social costs." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Thus, the evidence should only be exclude when but for the illegality the evidence would not have been discovery. *Segura*, 468 U.S. at 815. In the Fifth Amendment context, suppression is a mechanism to remedy failure to administer *Miranda* warnings where they are required. *Oregon v. Elstad*, 470 U.S. at 306.

Here there was no government misconduct of any kind, let alone misconduct that resulted in the illegal collection of evidence. The Defendant was afforded the right to counsel of her choosing after having been properly advised of her rights.

E. Assuming *arguendo* a conflict existed, the Defendant was aware of the conflict and waived it.

The Defendant argues, after the fact, she did not make a "knowing and intelligent waiver" because of Mr. Schuler's alleged conflict of interest impacted the effectiveness of his representation. However, that argument is belied by the facts of this case. First, the Defendant has not identified a conflict of interest beyond mere speculation—the Defendant has identified no advantage Mr. Schuler gained via the advice given to the Defendant. Second, even assuming an other than professional interest by Mr. Schuler, the Defendant has provided no evidence to show the alleged conflict impacted the advice provided by Mr. Schuler. Instead, the Defendant announced, upon hearing her rights, that she intended to speak to law enforcement after she spoke to her attorney. The state of the record demonstrates, Mr. Schuler did not cause his client to speak to law enforcement; the Defendant had already announced her intention to speak with law enforcement.

United States' Response to Defendant's Motion for Suppression – 10

The Defendant repeatedly indicated her willingness to speak with law enforcement and reiterated she just wanted to tell the truth.

Again, assuming *arguendo,* Mr. Schuler had a conflict, the Defendant was fully aware of any conflict of interest held by Mr. Schuler at the time of her requests to confer with Mr. Schuler. The Defendant opines Mr. Schuler was conflicted by his vehicle being involved in the criminal offense, the Defendant residing in an apartment Mr. Schuler owns, and the desire to distance himself from the acts of the Defendant. ECF No. 100 at pg. 5-6. The Defendant, however, at the time she requested the presence of Mr. Schuler, was certainly in a position, to be fully privy to these facts. To the extent there was a conflict, which the United States does not concede, the Defendant knowingly waived it.

An attorney's conflict of interest can be waived by a defendant. *United States v. Allen*, 831 F.2d 1487, 1494 (9th Cir. 1987). In considering the facts and circumstances of this case, the Defendant's repeated requests for the presence of Mr. Schuler, knowledge of any potential conflict, and continued waiver of her rights, is confirmation she desired to waive any conflict of interest held by Mr. Schuler. In this case, the Defendant was well aware of the consequences of her waiver: (1) anything she said could be used against her; and (2) regardless of her waiver, she was going to jail that evening. Still she maintained, just as she had indicated prior to Mr. Schuler's presence, she wanted to speak to law enforcement after she spoke to her attorney.

Moreover, the Government is entitled to presume that an attorney would act in an ethical manner with regarded to perceived conflicts. *Burger v. Kemp*, 483 U.S. 776, 784 (1987) ("we generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client."). Therefore, if Mr.

United States' Response to Defendant's Motion for Suppression – 11

Schuler had breached his ethical obligations[2], the consequences of that breach should not be borne by the Government. *See United States v. Kossak*, 275 F.Supp. 2d 525, 530 (D. Del. 2003), *aff'd*, 178 F.App'x 183 (3d Cir. 2006).

The Defendant was provided counsel of her choosing and made a knowing, intelligent, and voluntary waiver of her *Miranda* rights. If there was an ethical breach by her chosen attorney, it should result in discipline for that attorney, not the government. The Defendant's motion to suppress should be denied.

## IV.    Conclusion

Based on the foregoing, the Defendant knowingly, intelligently, and voluntarily waived her rights and afforded counsel of her choosing. Therefore, the Court should deny the Defendant's motion to suppress.

Dated: March 30, 2020.

William D. Hyslop
United States Attorney


*s/ Patrick J. Cashman*
Patrick J. Cashman
Assistant United States Attorney

---

[2] The United States notes that there is no evidence before the Court detailing the conversation between Mr. Schuler and the Defendant prior to the Defendant confirming she wanted to be interviewed, thus the government is left to speculate as to Mr. Schuler's advice.

United States' Response to Defendant's Motion for Suppression – 12

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Kenneth Therrien:  kentherrien@msn.com
Rick Hernandez:    rick@rickhernandez.lawyer
Rick Smith:        rasmith@house314.com
Troy Lee:          troylee@troyleelaw.com

*s/ Patrick J. Cashman*
Patrick J. Cashman
Assistant United States Attorney